**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

AKBAR M. ALI, M.D.; OMAR S. HUSSAIN, D.O.; UMAR M. SHAKUR, D.O.; ASIM K. BABAR, M.D.,

*Plaintiffs*,

v.

SAMEER VOHRA, in his official capacity as Director of the Illinois Department of Public Health; MARIO TRETO, JR., in his official capacity as Secretary of the Illinois Department of Financial and Professional Regulation; TERRY PRINCE, in his official capacity as the Director of the Illinois Department of Veterans Affairs,

*Defendants*.

Case No. 26-11351

**VERIFIED COMPLAINT**

## NATURE OF THE ACTION

1. Islamic medical tradition goes back over one thousand years. Between the eighth and fifteenth centuries, Muslim societies supported one of the most sophisticated medical traditions in the world. During this time, Muslim physicians and scholars made significant contributions to medical knowledge that have helped to shape the development of modern medicine.

2. For example, the Muslim physician Abu Bakr Muhammad ibn Zakariyya al-Razi was the first person to distinguish measles from smallpox, allowing for distinct diagnoses and treatments to develop. Another Muslim physician and scholar, Ibn Sina, established a school of medicine combining both physical and psychological well-being, more commonly known today as a holistic approach to healing. And the Islamic medical tradition is responsible for the use of alcohol as an antiseptic.[1]

3. That tradition of healing and excellence continues to this day. Inspired both by their belief that life is a blessing granted by Allah and by the Qurʿān's teaching that "whoever saves a life, it will be as if they saved all of humanity," American Muslims continue to enter the healthcare professions at a high rate.

4. Indeed, while Muslims account for just 1% of the U.S. population, by some estimates American Muslims account for nearly 5% of all physicians in the U.S. And more than 10% of American Muslims self-report as physicians or dentists.[2]

---

[1] Azeem Majeed, *How Islam Changed Medicine*, 331 BMJ 1486, 1486-87 (2005).

[2] Pew Rsch. Ctr., *Religious Landscape Study: Muslims* (2025), https://perma.cc/T5XH-VTJB (percentage of Muslim adults in the U.S.); Initiative on Islam and Med., *National Survey of Muslim Physician Attitudes towards Religion and Medicine*, https://perma.cc/E2UX-L2P9 (percentage of U.S. physicians who are Muslim).

5. Dr. Akbar Ali, Dr. Omar Hussain, Dr. Umar Shakur, and Dr. Asim Babar are part of this legacy. Each of these doctors carries on the healing tradition of Muslim physicians in their home state of Illinois.

6. These dedicated doctors serve patients of all faiths and none. In their clinical work, they frequently see patients facing crises, life-changing diagnoses, and terrifying uncertainty. In those moments of vulnerability, Plaintiffs seek both to heal their patients and to treat them with dignity and compassion so that they do not fall into despair.

7. This kind of compassionate care is perhaps more important now than ever, with the rate of suicide continuing to rise across the nation, particularly among some of the most vulnerable populations, including the poor and elderly. Increasingly, Plaintiffs feel compelled to combat the lie that some lives are not worth living and that giving up is the only option.

8. Illinois should celebrate these efforts to help its neediest citizens. At the very least, Illinois ought to heed federal law, which bans the use of federal healthcare funds for assisted suicide, and forbids Illinois from discriminating against those who, like Plaintiffs, refuse to participate in assisted suicide.

9. Instead, Illinois has put Plaintiffs and other Muslims providing health care in Illinois to a stark choice: either abandon their religious beliefs that human life is sacred or face significant fines and penalties.

10. Through its euphemistically-named End-of-Life Options for Terminally Ill Patients Act, and the Act's incorporation of burdens imposed by the Health Care

Right of Conscience Act, Illinois has conscripted even religious physicians to participate in the provision of physician-assisted suicide.

11. Beginning September 12, physicians caring for terminally ill Illinois residents must now proactively inform and counsel their patients about their "option" to kill themselves.

12. This "Suicide Counseling Mandate" is far broader than anything required by states like California, Oregon, and Washington. And jurisdictions such as New Zealand and Victoria, Australia, which have also legalized assisted suicide, expressly forbid doctors from raising assisted suicide with their patients. Yet Illinois now requires it.

13. These national and international norms against doctors raising assisted suicide with their dying patients exist for good reason. Public health researchers have extensively documented that an increase in the public discussion of suicide is often followed by an increase in suicide rates.

14. Illinois physicians and mental health professionals now must also participate throughout the multi-step process of qualifying their patients to receive lethal suicide drugs.

15. The many Illinois nurse practitioners, doctors, mental health professionals, pharmacists, hospitals, and care homes with religious or moral objections to participating in assisted suicide have nowhere to go, because Illinois' purported "opt-out" still requires religious physicians like Plaintiffs to directly participate in and materially assist the *same* medicalized suicides to which they object. The Muslim

patients who do not want to be offered the chance to kill themselves at their lowest moment will be left out in the cold.

16. None of this is permitted by the Constitution. Indeed, the First Amendment's protections apply four times over.

17. First, its protection of the free exercise of religion prohibits the government from burdening the sincere religious beliefs of Plaintiffs and the patients they serve unless the state is furthering an interest of the highest order and using the least-restrictive means to do so—an exceedingly high bar Defendants cannot meet.

18. Second, its protections against religious gerrymanders prohibit the government from enacting legal burdens that fall uniquely on religious adherents—such as those who object to providing assisted suicide.

19. Third, its protections against compelled speech prevent the government from forcing Muslim doctors and nurses to speak the government's preferred, supportive message of assisted suicide.

20. And fourth, its protections for freedom of association allow Muslim physicians to serve Muslim patients who seek them out for religiously-compliant care, without being forced to speak messages that undermine their shared religious expression.

21. Illinois claimed that the End-of-Life Options Act was passed to "provide[] an additional end-of-life care option for terminally ill individuals who seek to retain their autonomy and some level of control over the progression of the disease as they near the end of life or to ease unnecessary pain and suffering." 410 ILCS § 22/5(a)(2). Illinois also claimed that it would still respect the "fundamental right [of patients] to

determine their own medical treatment options in accordance with their own values, beliefs, or personal preferences." *Id.* § 22/5(a)(4). But, in passing the Act, Illinois has stripped that very choice away from Plaintiffs and their patients—denying the choice of a dignified death to the many residents of Illinois who, following their sincere religious beliefs, wish to die naturally, secure in the knowledge that they will not be urged by their physicians to consider cutting short their life through suicide.

22. The Court can address these problems by enforcing federal law and the First Amendment and finding that Illinois cannot coerce religious physicians in this way. That approach would leave the End-of-Life Options Act generally in force. Alternatively, the Court could also invalidate the entire End-of-Life Options Act, because it violates the Americans with Disabilities Act, the Equal Protection Clause, and the Supremacy Clause. Either way, Illinois' effort to control religious physicians and their patients is unlawful and cannot stand.

## JURISDICTION AND VENUE

23. This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

24. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

25. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because Defendants reside in the Northern District of Illinois. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Northern District of Illinois.

## IDENTIFICATION OF PARTIES

26. Plaintiff Akbar M. Ali is a Muslim physician practicing in Evanston, Illinois, with a specialty in internal medicine.

27. Plaintiff Omar S. Hussain is a Muslim physician practicing in Libertyville, Illinois, with a specialty in pulmonology.

28. Plaintiff Umar M. Shakur is a Muslim physician practicing in Chicago, Illinois with a specialty in cardiology.

29. Plaintiff Asim K. Babar is a Muslim physician practicing in both Ottawa, Illinois, and Peru, Illinois, with a specialty in cardiology.

30. Defendant Sameer Vohra is the Director of the Illinois Department of Public Health. He is charged with promulgating rules to effectuate EOLOA. 410 ILCS § 22/105. He is also responsible for overseeing the referral of physicians for rule breaking to the Illinois Department of Financial and Professional Regulation. *See* 225 ILCS § 60/23; *id.* § 60/25. And, through a cooperative agreement with the U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services, he is also responsible for ensuring that facilities accepting Medicare and Medicaid payment for services rendered to program beneficiaries meet federal regulations and certification rules. He is sued in his official capacity only.

31. Defendant Mario Treto, Jr., is the Secretary of the Illinois Department of Financial and Professional Regulation. He is responsible for administering and regulating physician, nursing, and pharmacist licenses in Illinois and exercises

disciplinary authority over physicians and nurses. 225 ILCS § 65/70-80(c). He is sued in his official capacity only.

32. Defendant Terry Prince is the Director of the Illinois Department of Veterans Affairs. He is charged with promulgating rules to effectuate EOLOA. 410 ILCS § 22/105. He is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### *The Illinois End of Life Options Act and the Illinois Health Care Right of Conscience Act*

33. For close to 30 years, federal law has prohibited the use of federal healthcare funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." Assisted Suicide Funding Restriction Act of 1997 § 3(a)(1), 42 U.S.C. § 14402(a)(1).

34. More recently, the Affordable Care Act has made clear that "any State … that receives Federal financial assistance," including Medicaid or Medicare funds, "may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a). On information and belief, Illinois is one such state.

35. As a general matter, Illinois law prohibits offering to help someone commit suicide. Indeed, it is a felony to "intentionally … offer[] and provide[] the physical means by which another person commits or attempts to commit suicide,

or … participate[] in a physical act by which another person commits or attempts to commit suicide." 720 ILCS § 5/12-34.5(a)(2). Nor may one "coerce[] another to commit suicide" by "exercis[ing] substantial control over the other person through (i) control of the other person's physical location or circumstances; (ii) use of psychological pressure; or (iii) use of actual or ostensible religious, political, social, philosophical or other principles." *Id.* § 5/12-34.5(a)(1).

36. Despite these clear federal bans, and in direct contradiction to Illinois' own general prohibition against assisting suicide, Governor Pritzker signed the Illinois End-of-Life Options for Terminally Ill Patients Act (EOLOA) into law on December 12, 2025, with an effective date of September 12, 2026. *See* 410 ILCS § 22/1 *et seq.*

37. EOLOA declares that "mentally capable adult individuals have a fundamental right to determine their own medical treatment options in accordance with their own values, beliefs, or personal preferences," and that access to suicide "is an expression of this fundamental right." 410 ILCS § 22/5(a)(4).

38. It also declares that assisted suicide "is part of general medical care." *Id.* § 22/5(a)(1).

39. EOLOA delegates rulemaking authority "for the implementation and administration of this Act" to the Department of Veteran's Affairs and the Department of Public Health. *Id.* § 22/105.

40. EOLOA defines covered healthcare entities to include "hospital[s] or hospital affiliate[s], nursing home[s], hospice[s]," and facilities licensed under "the Ambulatory Surgical Treatment Center Act; the Home Health, Home Services, and

Home Nursing Agency Licensing Act; the Hospice Program Licensing Act; the Hospital Licensing Act; the Nursing Home Care Act; or the University of Illinois Hospital Act." *Id.* § 22/10. EOLOA defines covered heath care professional to include "physician[s], pharmacist[s], or licensed mental health professional[s]. *Id.*

41. By contrast, neither assisted living facilities, 210 ILCS § 9/10 *et seq.*, nor hospice programs that provide home care, inpatient care, or both, 210 ILCS § 60/3 (h-5), are included in this broad list. Thus, although both assisted living facilities and hospice programs regularly care for dying patients, they have no obligations imposed on them by EOLOA.

42. If a patient wants to commit physician-assisted suicide at any of the facilities listed in the Act, there is a carefully constructed and detailed process for the patient to do so. First, the process is only open to a subset of patients—those whom the statutes define as having a "terminal disease." Whether the patient's diagnosis is terminal is patient-specific—it depends on whether that particular patient, based on the physician's "reasonable medical judgment," has a disease that will "result in death within 6 months." 410 ILCS § 22/10.

43. For patients who qualify, the assisted suicide process can be broken down into four steps: (1) informing patients and counseling them about their ability to obtain lethal drugs, (2) qualifying the patient through required documentation of two oral requests and a written request, (3) prescribing the lethal drugs, (4) having the prescription filled at a licensed pharmacy, and (5) the patient taking the lethal drugs to commit suicide.

Informing and Counseling

44. Studies of U.S. states that have legalized assisted suicide show an increase in suicide rates overall, particularly among older adults.[3] This result is not surprising, since researchers have found that "suicide contagion" can occur "when the exposure to suicide" of another person "influences others to attempt suicide." U.S. Ctrs. for Disease Control & Prevention: Suicide Prevention, *Guidelines for Reporting a Suicide Cluster* (May 27, 2026), https://perma.cc/4W9X-ZSVM. This exposure can happen both directly (through exposure to the suicide of someone personally known) and indirectly (through media reporting about someone who has committed suicide), and the effect is much greater when the person reported about is a respected celebrity. *Id.*; World Health Org., *Preventing suicide: a resource for media professionals* 8 (2023), https://perma.cc/WZ6R-9QXP (noting consistent results over 100 studies; observing that the effect of a media report is greater when the person involved is a celebrity).

45. To their patients, doctors are often respected voices of authority. For a seriously ill patient, hearing from a trusted doctor that they have the "option" of assisted suicide may exert an influence not unlike suicide contagion. This helps explain why New Zealand and Victoria, Australia, ban doctors from raising assisted suicide with their patients. End of Life Choice Act 2019, pt 2, s 10 (N.Z.) ("Assisted

[3] David Albert Jones & David Paton, *How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?*, 108 S. Med. J. 599, 602 (2015) (finding "strong evidence that the legalization of [assisted suicide] is associated with increases in the rate of suicide, if assisted suicides are included").

dying must not be initiated by the health practitioner"); *Voluntary Assisted Dying Act 2017* (Vic) pt 1 div 8 ("Voluntary assisted dying must not be initiated by registered health practitioner").

46. Indeed, it is for reasons like these that the American Medical Association continues to oppose assisted suicide as "fundamentally incompatible with the physician's role as healer," "difficult or impossible to control," and posing "serious societal risks." Am. Med. Ass'n, *Opinion 5.7: Physician-Assisted Suicide*, in *Code of Medical Ethics* (2d ed. 2022), https://perma.cc/B6WQ-9RXT.

47. Illinois previously passed the Suicide Prevention, Education, and Treatment Act, Public Act 93-907, and created the Illinois Suicide Prevention Alliance, which works to prevent suicides within the State.[4]

48. By passing EOLOA, Illinois has taken a drastically different tack and attempted to force unwilling physicians to participate in assisted suicide. Illinois now requires physicians to counsel their terminally ill patients about assisted suicide.

49. EOLOA and the HCRCA impose extensive informing and counseling obligations on Illinois physicians. EOLOA is triggered by the diagnosis of a "terminal disease," which EOLOA defines as "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." 410 ILCS § 22/10.

50. When a patient is diagnosed with a terminal disease, EOLOA requires his "attending physician," the "physician who has primary responsibility for the care of

---

[4] Ill. Dep't of Pub. Health, *Suicide Prevention*, https://perma.cc/5SMH-T7J9.

the patient and treatment of the patient's terminal disease," *id.*, to offer to provide the patient with information regarding "the foreseeable risks and benefits" of all end-of-life-care options, *id.* § 22/15(b). This includes the "potential risks and benefits" of taking suicide drugs. *Id.* § 22/10.

51. EOLOA doubles down on this requirement, stating that "[n]othing in this Act may be construed to limit the amount of information provided to a patient to ensure the patient can make a fully informed health care decision." *Id.* § 22/15(a).

52. EOLOA also "incorporate[s] by reference" the Healthcare Right of Conscience Act (HCRCA), *id.* §§ 22/60(g), 22/65(g), which also includes a duty to inform and counsel patients about the benefits of suicide, *see* 745 ILCS § 70/1 *et seq*.

53. The HCRCA purports to provide conscience protections to physicians, stating that no physician "shall be civilly or criminally liable … by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel." *Id.* § 70/4.

54. However, the HCRCA also provides that that protection only applies if the objecting physician follows certain protocols. *Id.* § 70/6.1. These protocols "*shall* inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner." *Id.* § 70/6.1(1) (emphasis added); *see also id.* § 70/6 ("Nothing in this Act shall relieve a physician from any duty … to inform his or her patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of treatment options").

55. The protocols must also address what must occur if a patient requests a "treatment option" that "is contrary to the conscience of the health care facility, physician, or health care personnel." *Id.* § 70/6.1(2). In those instances, the objecting physician has two options: Either he "shall" ensure that the patient will be "provided the requested health care service by others in the facility," or he "shall … refer the patient to," "transfer the patient to," or "provide in writing information to the patient about" "other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in." *Id.* § 70/6.1(2)-(3).

56. Now that assisted suicide is a "legal treatment option[]" for Illinois residents, the HCRCA, in addition to EOLOA, also requires physicians to counsel patients about the "benefits" of committing suicide. *Id.* § 70/6.[5]

57. The HCRCA defines covered healthcare facilities exceedingly broadly to cover all "institution[s] or location[s] wherein health care services are provided to any person," including "dispensar[ies]." *Id.* § 70/3(d). The HRCRA defines "physician" as "any person who is licensed by the State of Illinois under the Medical Practice Act of 1987." *Id.* § 70/3(b).

---

[5] The State of Illinois is currently challenging an order permanently enjoining 745 ILCS § 6.1(1)'s requirement that providers discuss the "benefits" of assisted suicide. *See* Cross-Appellant's Br., *NIFLA v. Treto*, Nos. 25-1603, 25-1659, 25-1655, 25-1657 (7th Cir. Oct. 27, 2025) (argued Apr. 10, 2026).

<u>Qualifying</u>

58. Once a patient has been diagnosed with a terminal disease and informed of his legal treatment options, he can begin the process of obtaining lethal drugs to commit suicide under EOLOA. To do so, a terminally ill patient must first make an initial oral request to his attending physician. 410 ILCS § 22/25(a). This oral request "shall be documented by the attending physician." *Id.* § 22/25(a)(2).

59. After the first oral request, the patient must then request suicide in writing, using a form specified in EOLOA. *Id.* §§ 22/25(a)(3), 22/30. The patient's written request must be signed by the patient and witnessed by at least two adults. *Id.* § 22/30. The written request attests that the patient has been informed of "the risks and benefits" of taking the suicide drugs, as well as "that the likely outcome … is death." *Id.* § 22/30(e).

60. The patient must also make a second oral request for suicide, no sooner than five days after the first. *Id.* § 22/25(a)(4). This requirement is removed "if the individual's attending physician has medically determined that the individual will, within reasonable medical judgment, die within 5 days after making the initial oral request." *Id.* § 22/25(c).

61. Separate from the attending physician's responsibility to oversee and document any request for suicide, the physician also "shall conduct an evaluation" that, among other things, (1) confirms that the patient has a terminal disease, has decision-making capacity, and is requesting assisted suicide voluntarily; (2) informs the patient of the diagnosis, prognosis, and "potential risks, benefits, and probable

result of self-administering" the suicide drugs as well as other "feasible" end-of-life alternatives; and (3) "refer[s] the patient to a consulting physician for medical confirmation that the patient" is eligible for suicide. *Id.* § 22/35(a). The consulting physician must perform a similar "evaluation" and "confirm [his findings] in writing to the attending physician." *Id.* § 22/40.

62. Once the consulting physician has confirmed eligibility, the attending physician must "include the consulting physician's written determination in the patient's medical record." *Id.* § 22/35(a)(8).

63. The attending physician must also "refer the patient to a licensed mental health professional" if either the attending or consulting physician has doubts about the patient's ability to make an informed decision and "include the licensed mental health professional's written determination in the patient's medical record." *Id.* § 22/35(a)(9)-(10); *see also id.* § 22/45.

64. Finally, the attending physician must engage in extensive discussions regarding the act of committing suicide itself, including "inform[ing] the patient of the benefits of notifying the next of kin of the patient's decision to" commit suicide; "offering the patient an opportunity to rescind the request for" suicide; and apprising the patient of "the recommended procedure for self-administering" the suicide drugs and "the importance of having another person present when the patient self-administers" the drugs. *Id.* § 22/35(a)(11)-(13).

65. The attending physician must also document this entire process in the patient's medical record. *Id.* § 22/35(a)(16).

66. And throughout the entire process, the attending physician must "ensure that all steps are carried out in accordance" with EOLOA "before providing a prescription" for lethal drugs. *Id.* § 22/35(a)(13). Thus, the attending physician must not only participate in aiding patients to kill themselves but also supervise and facilitate the whole process—including those roles performed by consulting physicians and mental health professionals.

67. If a physician or facility is "unable or unwilling to carry out" a patient's request for suicide, then they must (1) inform the patient of the refusal to participate, (2) refer the patient "to a health care professional who is able and willing to evaluate and qualify the individual … in accordance with the Health Care Right of Conscience Act," and (3) document both the patient's request and facility's refusal in the patient's records. *Id.* § 22/70(b); *see also id.* § 22/25(f).

68. Moreover, if the patient is referred to another "able and willing" provider, the statute is equally clear that "[a] transfer of care or medical records does not toll or restart any waiting period" before the two additional requests required by the statute can be made *Id.* §§ 22/25(g), 22/70(b)(2). Thus, the mandatory act of documenting even the initial request continues to function as the first, necessary step in the qualification process.

69. And because the referral provision only covers "evaluat[ing]" and "qualify[ing]" the patient, *id.* § 22/70(b)(2), it does not alleviate physicians of their duty to counsel patients about the "benefits" of suicide, *id.* § 22/15(b), *see also id.* § 22/65(e), (forbidding healthcare entities from "prohibit[ting] a health care professional

from … providing information to a patient regarding the patient's health status, including, but not limited to, diagnosis, prognosis, recommended treatment and treatment alternatives, and the risks and benefits of each") or to document their initial request for suicide as the first step toward qualification, *id.* § 22/25(a)(2).

<u>Prescribing</u>

70. Once the patient's requests have been received and documented and the evaluations completed, including the confirmation of mental capacity from the consulting physician and, if applicable, the mental health professional, the attending physician can prescribe the suicide drugs or, "if authorized by the Drug Enforcement Administration, dispense the prescribed medication" directly. *Id.* § 22/35(a)(14)-(15).

<u>Ingesting</u>

71. As soon as the prescription is filled, the patient may obtain the drugs and commit suicide. *Id.* § 22/35(a)(14).

<u>Death Certificate</u>

72. EOLOA further provides that the cause of death on a patient's death certificate who dies after ingesting suicide drugs "shall be attributed to the underlying terminal disease," and the act of taking suicide drugs "shall not be indicated on the death certificate." *Id.* § 22/90.

<u>Gag Order on Objecting Physicians</u>

73. EOLOA imposes extraordinary consequences should an objecting physician fail to comply with his obligations under EOLOA.

Case: 1:26-cv-13515 Document #: 91 Filed: 09/12/26 Page 19 of 62 PageID #:19

74. EOLOA purports to prevent "[c]oercion or undue influence," which it defines as "the willful attempt, whether by deception, intimidation, or"—most importantly—"*any other means*," to "prevent a qualified patient, in a manner that conflicts with the Health Care Right of Conscience Act, from obtaining or self-administering" suicide drugs. 410 ILCS § 22/10 (emphasis added). It goes on to state that physicians can be held civilly or criminally liable for "[i]ntentionally or knowingly coercing or exerting undue influence on a patient with a terminal disease to … not use medication pursuant to this Act." *Id.* § 22/95(a)(2); *see also id.* § 22/95(c) (defining "intentionally" and "knowingly"). Thus, physicians who wish to advise or counsel patients against participating in suicide risk criminal liability unless they also comply with the HCRCA's mandate to refer the same patients to willing and able providers who will help them commit suicide.

75. EOLOA specifies one way in which physicians can be held liable for "coercion or undue influence," stating explicitly that "intentionally failing to transfer a patient and the patient's medical records to another health care professional in a timely manner" is deemed to be a "false, misleading, or deceptive practice[ ]" constituting "coercion or undue influence" subject to criminal penalties. *Id.* §65(f).

76. But though EOLOA specifies one specific avenue through which physicians can be held liable, it has hardly provided an exhaustive list of prohibited conduct. To the contrary, EOLOA potentially criminalizes "any … means" used to "prevent a qualified patient … from obtaining or self-administering" drugs. *Id.* § 22/10.

77. If EOLOA opens physicians up to potential criminal liability merely for failing to act by referring a patient to a willing provider, then *a fortiori* Muslim physicians, like Plaintiffs, could be held liable for following their religious convictions to actively encourage a patient to consider options other than assisted suicide.

<u>Exemptions</u>

78. As stated above, Illinois' assisted suicide counseling mandate is among the broadest in the nation. Even states like California, Oregon, and Washington do not require doctors to affirmatively raise assisted suicide with their terminally ill patients. *See* Cal. Health & Safety Code §§ 442.5(a)(2), 443.14(e); Or. Rev. Stat. § 127.885; Wash. Rev. Code. § 70.245.190.

79. But Illinois' religious exemptions are also among the narrowest in the nation. Even states like California, Oregon, and Washington allow religious doctors to opt out of all participation in assisted suicide, if that is what their faith requires. *See* Cal. Health & Safety Code §§ 442.5(a)(2), 443.14(e); Or. Rev. Stat. § 127.885; Wash. Rev. Code. § 70.245.190.

80. By stark contrast, in Illinois, all physicians must participate in EOLOA and the HCRCA's requirement to inform terminal patients about the "legal treatment" of suicide, including its "benefits." 410 ILCS § 22/15(b); 745 ILCS § 70/6.1(1).

81. And though physicians can escape some parts of the qualification process, they may do so only by first receiving and documenting the patient's request for death in his medical records—an act that EOLOA defines as the first step in the qualification process. 410 ILCS § 22/70(b)(2)-(3); 745 ILCS § 70/6.1(2)-(3).

EOLOA and the HCRCA's Collective Mandates

82. Through their sweeping obligations and limited exemptions, EOLOA and the HCRCA collectively impose the following mandates on physicians with religious objections to assisting their patients in committing suicide:

- **Suicide Information and Counseling Mandate:** Physicians must counsel terminal patients about the availability and benefits of killing themselves or else be held potentially criminally liable.
- **Suicide Qualification Mandate:** Physicians must assist any requesting terminal patient to qualify for assisted suicide by documenting the patient's request for suicide and the date of that request in his medical records, which serves as the necessary first step in the death process.
- **Suicide Referral Mandate:** Physicians who do not wish to participate in the full gamut of qualifying a patient for suicide must refer patients to an "able and willing" provider or else be held criminally liable.
- **Gag Order:** Physicians that encourage their dying patients to live to the end of their natural life instead of pursuing assisted suicide may be held civilly or criminally liable.
- **False Death Certificate Mandate:** Physicians signing death certificates must falsely state that the underlying terminal disease was the patient's cause of death, rather than the drugs that actually ended his life.

<u>Liability</u>

83. Violating EOLOA has significant consequences. As already described, the Act exposes physicians to both “civil” and “criminal liability” for “[i]ntentional misconduct” and for “coercing or exerting undue influence” on a patient to “not use medication.” 410 §§ 22/65(b), 22/95(a).

84. But the consequences do not end there.

85. Physicians can have their license revoked, suspended, or put on probation by the Department of Financial and Professional Regulation under the Medical Practice Act of 1987. *See* 225 ILCS § 60/22(A) (1)-(50). Among other things, punishable conduct includes the use of false or deceptive statements, recording false records, making misleading statements on the “value of” a particular medicine or treatment, and engaging in unethical or unprofessional conduct. *Id.* § 60/22(A)(4), (5), (10), (21), (31).

86. For each violation of the Medical Practice Act, the Department of Financial and Professional Regulation can impose a fine of up to $10,000. *Id.* § 60/22(A).

87. Illinois defines “unethical” and “unprofessional” conduct to include “any … act or omission that breaches the physician’s responsibility to a patient according to accepted medical standards of practice” or the failure to “generate medical records for any patient encounter and/or care as specified by accepted medical standards.” Ill. Admin. Code tit. 68, § 1285.240(a)(1), (2)(E), (P).

88. If a physician loses his license, Secretary Treto, through the Attorney General, can seek an injunction to stop that person from continuing medical practice. 225 ILCS § 60/61.

89. For its part, the HCRCA permits "[a]ny person" to bring an action and recover either treble damages "including pain and suffering," "the costs of the suit[,] and reasonable attorney's fees," or "$2,500 for each violation in addition to costs of the suit and reasonable attorney's fees," whichever is greater. 745 ILCS § 70/12. "These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law." *Id.*

***Islamic Teachings on Assisted Suicide***

90. Islam rejects assisted suicide.

91. For example, the British Board of Scholars and Imams, a national assembly of Imams and scholars in the United Kingdom, has stated, "[u]nequivocally, euthanasia is prohibited in Islam. This stems from Islam's high regard for the sanctity of human life, viewing life ultimately as a gift from Allah, and even instances of suffering are regarded in a spirit of optimism."[6]

92. The European Council for Fatwa and Research, an umbrella organization representing national Islamic councils throughout Europe, likewise holds that assisted suicide is prohibited, "for according to Shari'ah killing a patient suffering from a terminal illness is not permissible for the physician, the patient's family or the patient himself."[7]

---

[6] The Brit. Bd. of Scholars & Imams, *The BBSI's View on the Assisted Dying Bill: The Islamic Perspective*, https://perma.cc/UV6J-5TE5.

[7] Eur. Council for Fatwa And Rsch., *Final Statement: Eleventh Ordinary Session of the European Council for Fatwa & Research*: *Resolution 11/3*, https://perma.cc/BMD3-G6MG.

93. The influential Dar Al-Ifta in Egypt, which offers Islamic legal interpretation worldwide, has ruled that assisted suicide "is considered a major sin, as attested in a mass of Prophetic reports," and counsels that "[i]t is incumbent upon physicians to know that there is no obedience to other people in a matter that constitutes a disobedience to God. Whenever a patient asks this of them, they must not accede, nor [are they to] kill another person without right."[8]

94. Muslim scholars at Darul Qasim College in Illinois have reached the same conclusion.[9] Because human life is considered sacred, "taking one's own life—whether or not one is diagnosed with a terminal illness—is unequivocally prohibited."[10]

95. And because suicide is a sin, "facilitating and assisting in it will itself constitute a sin."[11] Thus, "[p]rescribing life-ending medications—or even referring patients to a prescriber—is not allowed."[12]

96. Beyond that, "facilitating suicide for terminally-ill patients seemingly affirms that such individuals are less valuable," contradicting the belief that there is "beauty, value, and goodness" that comes from those individuals.[13]

---

[8] Egypt's Dar Al-Ifta, *What Does Islam State About Euthanasia* (July 25, 2013), https://perma.cc/M29U-9U3W (alteration in original).

[9] Mufti Shaheer Pathan, et al., *Restoring Patients' Lives and Physicians' Conscience: An Islamic Treatment of Deb's Law* 2, Darul Qasim (2026), https://perma.cc/9PFQ-BZYD (hereinafter *Restoring Patients' Lives*).

[10] *Id.*; *see Sūrah an-Nisāʾ* 4:29.

[11] *Restoring Patients' Lives* at 3.

[12] *Id.*

[13] *Id.* at 4.

97. Instead of aiding in a terminally-ill patient's death, Muslims have a "communal responsibility to provide care and comfort to such individuals."[14]

98. Muslim physicians in particular have a religious obligation to take action that reflects their belief that "Allah … has not sent down any disease except that He sent down with it a cure."[15] Accordingly, when treating a terminally ill patient, Muslim physicians should "continue researching and looking for cures all the while making duʿāʾ (supplication) to Allah." [16]

99. Islam further prohibits lying. Muslim physicians therefore cannot attest to any falsehoods on a death certificate.[17]

***Dr. Akbar Ali***

100. Dr. Akbar Ali has been a practicing Muslim for more than 40 years. He was deeply influenced by his parents and his paternal grandmother, who taught him to read and write Urdu, so he would be able to access religious texts from the Subcontinent. He shares the religious beliefs about assisted suicide described above.

101. Dr. Ali graduated from medical school at Saint James School of Medicine in 2007, followed by residency in internal medicine at Mercy Hospital in Chicago, Illinois.

---

[14] *Id.*

[15] *Id.* at 5

[16] *Id.*

[17] *Id.*

102. Today, Dr. Ali works as an attending physician at a hospital in Illinois. His place of work is covered under EOLOA and the HCRCA. 410 ILCS § 22/10; 745 ILCS § 70/3(d).

103. Dr. Ali regularly treats patients who are suffering from terminal illnesses with a prognosis of six months or less. The majority of the patients that he treats are either diagnosed with advanced cancer while on the oncology unit at the hospital or experiencing complications from chemo-radiation treatment. He also works on the vascular unit, where patients are diagnosed with debilitating strokes or end-stage heart failure. Many of his patients have diagnoses that would qualify them for hospice—that is, they have a poor prognosis with less than six months likely survival.

104. Dr. Ali's faith is a significant part of his life. Dr. Ali tries to observe the five daily prayers at their appropriate times, even when he is at work. He observes the whole month of Ramadan by fasting during the day, even when he is working at the hospital, and he spends the evenings in congregational prayer for 29 or 30 nights. During Ramadan, his family works together to feed the hungry, and each year they give to help others who are facing difficult financial circumstances. In 2015, he completed the Hajj, a pilgrimage to Mecca that every practicing Muslim tries to undertake at least once in their life.

105. Dr. Ali practices medicine in accordance with his faith. As such, he understands his role as a physician to be one that extends life, cures illnesses, and eases the suffering of his patients. His grandmother, who battled heart disease, diabetes, and advanced kidney disease, had a profound effect on Dr. Ali and

motivated him to pursue the field of medicine while being true to his Muslim background and Islamic faith.

106. Dr. Ali regularly treats Muslim patients through his work at the hospital. He also helps Muslim family and friends who approach him for informal medical advice. When he does so, he tries to treat them in a way that respects the faith that they share.

***Dr. Omar Hussain***

107. Dr. Omar Hussain has been a practicing Muslim for 53 years. He was raised in a Muslim home in the western suburbs of Chicago, where he witnessed his parents and elders in the community establish Sunday schools, mosques, and safe spaces for worship and learning. He shares the religious beliefs about assisted suicide described above.

108. Dr. Hussain graduated from medical school at Kirksville College of Osteopathic Medicine in Missouri in 2001, followed by a residency and fellowship in Internal Medicine, Pulmonary Medicine, and Critical Care Medicine at Loyola University Medical Center and Hines V.A. Hospital in Maywood, Illinois.

109. Dr. Hussain continues to regularly treat veterans in both hospital and outpatient settings. His practice's proximity to the Captain James A. Lovell Federal Health Care Center (a V.A. Center) provides him the opportunity to care for hospitalized veterans on a weekly to monthly basis.

110. Today, Dr. Hussain practices as a Pulmonary, Sleep, and Critical Care physician in Illinois. His practice qualifies as a health care facility under the HCRCA.

111. Dr. Hussain regularly treats patients suffering from terminal illnesses with a prognosis of six months or less. Multiple times per week, he cares for patients with end-stage COPD and pulmonary fibrosis. During every clinic session, many of his patients require supplemental oxygen.

112. Dr. Hussain's faith is a central part of his life. He regularly attends Muslim Friday prayers, has completed the Islamic pilgrimage to Mecca (Hajj), and has worked with other Muslim scholars and medical professionals to submit over 10 abstracts focused on the intersection of ethics, faith, and medicine.

113. Dr. Hussain frequently treats Muslim patients and serves as a trusted guide for family and friends facing critical illness or pulmonary conditions. In his care for Muslim patients, he honors their shared values by educating patients and families on what to anticipate as they navigate end-of-life decisions.

***Dr. Umar Shakur***

114. Dr. Umar Shakur has been a practicing Muslim for his entire life. He shares the religious beliefs about assisted suicide described above.

115. Growing up, his mother's deep spirituality and faith taught him to remain optimistic even in challenging times, and was always a source of both guidance and reassurance. This was reinforced by his maternal grandmother, whose own faith was profound and connected to the Sufi tradition in Islam. She could recite entire poems from memory, was steadfast in reading the Qurʿān, and demonstrated deep love for the Prophet Muhammad (peace be upon him).

116. In college, while studying great western thinkers through the Common Core curriculum at the University of Chicago, Dr. Shakur realized that the

Enlightenment set into motion the trends leading to modern secularism, which favor reason over revelation and look to center man as the authority in the world. Struggling to reconcile this with his own faith, he came across Imam Ghazali's "Deliverance from Error" which greatly renewed his faith by reminding him that faith is a gift, a light, that is placed in the heart.

117. Dr. Umar Shakur graduated from medical school at Midwestern University (Chicago College of Osteopathic Medicine) in 2006, followed by internal medicine residency in Milwaukee, Wisconsin at the Medical College of Wisconsin. He went on to do a cardiology fellowship at the St Vincent Hospital in Worcester, MA, which he completed in 2014.

118. Today, Dr. Shakur is the Chair of Cardiovascular Medicine at a hospital in Illinois. His place of work is a covered entity under EOLOA and the HCRCA. 410 ILCS § 22/10; 745 ILCS § 70/3(d).

119. As a cardiologist, Dr. Shakur often treats patients near the end of life. Cardiac patients often have to face difficult symptoms near the end of life like shortness of breath and chest pain, and must make decisions about their goals of care.

120. Dr. Shakur's faith is a significant part of his life. As a practicing Muslim, his day is structured by his religious practices. For example, he performs his five daily prayers, many of them in the hospital prayer space. In addition, he attends the weekly Friday religious service (called Jummah) also often in his hospital prayer space, with other members of his faith community. There are often fifty or more Muslim staff

members who participate in the hospital Friday prayer service. In addition, Dr. Shakur continues his academic and intellectual study of Islam. For many years, he has presented papers or panels at the Conference on Medicine and Religion, which is a national annual academic conference on the intersection of faith and medicine. Dr. Shakur also recently gave a grand rounds conference at his hospital on "Perfecting Practice: The Case for Ethics in Medicine" to the general hospital community.

121. Dr. Shakur practices medicine in accordance with his faith. He understands that Allah (God) is the One who heals, as the Prophet Abraham (peace be upon him) taught in a story related in the Qurʿān. Thus, the Muslim physician attempts to attract Allah's Divine attention and *Shifa*, which is the ultimate source of any cure. This is done through prayer for the patient, presence with the patient, and using medical therapies and treatments that are, whenever feasible, halal.

122. As an example of the importance of presence, during the COVID pandemic, Dr. Shakur regularly went to the patient's bedside, rather than avail himself of telehealth options that the hospital provided, so that he could be in the room with the patient. Even in his current practice, Dr. Shakur does not use telehealth options in providing care for his patients, because he believes in the power of presence with the patient in attracting Allah's cure.

123. This does not mean that Dr. Shakur does not avail his patients of the full opportunities of modern cardiovascular care, indeed his patients are on the latest and best medications, receive appropriate procedural interventions and devices, and obtain advanced imaging and testing when needed. But it means that there is an

extra layer of care that comes from presence, from praying for his patients, from seeking Allah (God) not as the treatment of last resort (i.e. when all else fails), but with the initiation of any treatment.

124. Even in conversations with his non-Muslim patients, Dr. Shakur will frequently say, “God willing” or “thank God” in discussing the patient’s condition or situation, and he finds that most people are actually appreciative of this.

125. Dr. Shakur finds that the ultimate goal of medicine thus lies in optimism, based on the Prophetic statement that there is a cure for every illness. Thus, the medical enterprise is motivated in seeking and finding these cures and treatments.

126. Death is never a treatment option for any physician. It is a certainty that we fall face, but with the knowledge that we have a responsibility to live our life to the last moment, that with every hardship comes ease, and that no one is given more than they can bear. These Islamic concepts are universally true for all people, but the timeframe has to be expanded beyond the worldly life to also include the Hereafter.

127. Dr. Shakur regularly treats Muslim patients. In so doing, it is important that he is able to express his sincerely-held religious beliefs when it comes to the harms of medical-aid-in-dying. It is antithetical to the religious beliefs and practice he shares with his Muslim patients, and a betrayal of the very aim of medicine in any culture or civilization.

128. In Dr. Shakur’s view, this modern idea of using death as a treatment option is based on an understanding that there is no life beyond this one, and that does not

recognize that life is a gift that no one chose, and thus one that no one has the right to prematurely end.

129. Dr. Shakur often reflects on the story of one of his distant relatives (second cousin of his mother), who was suffering from widely metastatic cancer. He had an incredible amount of bone pain and was on powerful pain medications that he would get every 1-2 hours plus a pump for pain relief. Despite these interventions, he still experienced a great deal of pain. However, he was always smiling. When asked why he smiled so much, he would answer, "I know that I may pass away at any time, and I hope to pass away smiling so that Allah knows I am grateful to Him." This is an example of the profound impact that faith plays in dealing with what would otherwise be considered terrible pain. Rather than seek medical-aid-in-dying, he exemplified the power of gratitude and understanding that everything in this world is temporary, while the life to come is everlasting.

***Dr. Asim Babar***

130. Dr. Asim Babar has been a practicing Muslim for nearly forty years. He shares the religious beliefs about assisted suicide described above.

131. Dr. Babar graduated from medical school at Wright State University School of Medicine in 2013, followed by residency in internal medicine at University of Texas Health Science Center in 2016 and a subsequent fellowship in Cardiovascular Disease at the University of Texas in 2019.

132. Today, Dr. Babar works as a cardiologist at a hospital in Illinois. His place of work is a covered entity under EOLOA and the HCRCA. 410 ILCS § 22/10; 745 ILCS § 70/3(d).

133. Dr. Babar was raised in a Muslim home. He relied on that faith to handle the loss of his father to heart disease when he was 12, and his mother to breast cancer when he was 19. Since then, Dr. Babar has continually tried to increase his understanding of and devotion to his faith.

134. Dr. Babar's faith is a significant part of his life. He prays five times daily, observes the annual fasts during Ramadan, regularly practices charitable giving and service, and is currently planning a pilgrimage to Mecca. He also seeks more knowledge and faith under the guidance of religious teachers.

135. Dr. Babar practices medicine in accordance with his faith. As such, he understands his role as a physician to be one that extends life, cures illnesses, and eases the suffering of his patients. Because he sees his work as ultimately being in service to God, his faith instructs him to strive for excellence in his work and to provide altruistic service through his medical practice. He strives to see each patient as a human being with a soul, who first needs to be heard, and then connected with in order to help them through vulnerable times.

136. Dr. Babar often treats patients who are suffering from advanced or unstable cardiac disease that can often be fatal. These diseases include some that are chronic and progressive and can lead to death, meaning that he treats patients who may have less than six months left to live.

137. When Dr. Babar treats Muslim patients, he tries to do so in a way that respects the faith that they share.

***Plaintiff Physicians' Beliefs and Practices under EOLOA***

138. Each Plaintiff regularly treats patients who are suffering from terminal illnesses with a prognosis of six months or less.

139. Each Plaintiff regularly treats patients who are considered disabled under the Americans with Disabilities Act, or who are veterans.

140. Each Plaintiff is authorized to sign death certificates.

141. Because each Plaintiff believes human life is sacred, while providing care for his patients, he will not:

- inform his patients about, or to discuss with his patients, the option to end their lives with lethal drugs;
- take any other step that would facilitate the provision of lethal drugs to his patients for the purpose of ending their lives;
- assist a patient in qualifying for the drugs used to end life by recording oral or written requests for those drugs in the patient's medical files;
- certify or examine patients in order to certify their fitness to receive lethal drugs in order to end their lives;
- prescribe or order lethal drugs to a resident for the purpose of voluntarily ending the residents' own lives;
- be present when patients use lethal drugs to end their own lives; or
- write false information on a death certificate indicating a patient's cause of death was an underlying illness instead of lethal drugs.

Each Plaintiff considers each one of these actions to be facilitating and assisting in the evil of assisted suicide, and he sincerely believes that taking any of these actions would be morally wrong and religiously forbidden.

142. If confronted with a request for assisted suicide, each Plaintiff would instead meet the request with compassion and love, endeavoring to understand the reasons behind the request and to identify the supports that could be provided to ameliorate those concerns. Most of all, each Plaintiff would wish to reiterate to his patients that he regards their life as valuable, and that he will use all the skill and ability he has as a doctor to help heal their sickness and alleviate all kinds of pain they may experience. Each Plaintiff would remind his patient that life is a blessing and that there is beauty, value, and goodness in struggling with the challenges of life.

143. The Plaintiffs will not prevent a patient from transferring out of their care to undertake the process of obtaining lethal drugs to commit suicide, nor will they refuse to transfer a patient's records to a new provider that the patient has already independently identified.

144. However, because of their belief that human life is sacred, the Plaintiffs will not help a patient locate or identify a provider who will assist in their efforts to receive lethal drugs to commit suicide. Each Plaintiff would consider this to be facilitating and assisting in the evil of assisted suicide and morally and religiously forbidden.

145. Taken together, all of these measures allow each Plaintiff to practice his profession as a doctor in a way that is consistent with his sincere religious beliefs about the importance of natural death.

***Effects of EOLOA and the HCRCA on Plaintiffs***

146. Under EOLOA and the HCRCA, Dr. Akbar Ali, Dr. Omar Hussain, Dr. Umar Shakur, and Dr. Asim Babar, under threat of civil or criminal penalties, are required:

- to provide terminally ill patients with both information and counseling regarding the availability of assisted suicide and the supposed benefits of lethal drugs;
- to perform a necessary step in qualifying the patient for assisted suicide by documenting a patient's request for suicide.
- to refer patients to a willing provider or facility to assist the patient in qualifying for and obtaining assisted suicide drugs;
- to refrain from encouraging or counseling patients to continue their lives and seek alternative treatments rather than committing suicide and;
- to attest to false information on a death certificate indicating a patient's cause of death was an underlying illness instead of lethal drugs.

147. If Plaintiffs do not conform to the government's pressure to act according to these requirements and prohibitions, they risk professional discipline and the loss of their licenses.

148. EOLOA and the HCRCA are the direct and proximate causes of these irreparable harms.

149. Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF
## Count I
## 42 U.S.C. § 1983
## Violation of U.S. Const. Amend. I: Free Exercise Clause
## Not Generally Applicable: Categorical Exemptions

150. All preceding paragraphs are incorporated by reference.

151. "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

152. Prior to EOLOA and its incorporation of the HCRCA, Illinois had a generally applicable, "across-the-board criminal prohibition on a particular form of conduct": assisting another to commit suicide. *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990); *see* 720 ILCS § 5/12-34.5.

153. The religious beliefs of the Plaintiffs are in accord with that prohibition; indeed, their religious beliefs categorically forbid them from assisting in any way in another's suicide, including by referring them to someone who they know will assist in that suicide. These same religious beliefs also compel them to encourage anyone indicating a desire for suicide to pursue another path.

154. But through EOLOA, Illinois has carved out a highly detailed, multi-step exemption to the across-the-board rule, rendering EOLOA not generally applicable.

155. Because of EOLOA and its incorporation of the HCRCA, Illinois now divides its approach to suicide by placing individuals into two different categories: if a patient is deemed to have a terminal disease under EOLOA, a physician's *failure to assist* in that patient's suicide opens them up to criminal liability; but if that individual seeks assistance in committing suicide for any other reason, providing that assistance

opens those same physicians up to criminal liability under Illinois' general criminal prohibition against assisting another person to commit suicide.

156. Whether a person's suicide may or may not be assisted thus turns on an "individualized governmental assessment of the reasons for the relevant conduct"—refraining from providing assistance in committing suicide. *Smith*, 494 U.S. at 884; *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

157. Numerous exemptions within EOLOA and its incorporation of the HCRCA further underscore that it is not generally applicable. These exemptions include but are not limited to the following:

a. EOLOA covers general hospitals and their affiliates, nursing homes, hospices, ambulatory surgical treatment centers, and home health and nursing providers, while excluding other healthcare facilities where a patient might receive a terminal diagnosis, such as an in-home hospice program or an assisted living facility. 410 ILCS § 22/10. This renders EOLOA not generally applicable.

b. EOLOA applies only to the "physician who has primary responsibility for the care of the patient and treatment of the patient's terminal disease" and to a "physician who is qualified by specialty or experience to make a professional diagnosis and prognosis regarding the patient's disease" who gives a second opinion, id., carving out any other medical provider who may provide significant care to the patient. This renders EOLOA and its incorporation of the HCRCA not generally applicable.

c. EOLOA's obligation to refer a patient to an "able and willing" provider … in accordance with the Health Care Right of Conscience Act" applies only to "healthcare professional[s]," defined as "physician[s], pharmacist[s], or licensed mental health professional[s]." *Id.* § 22/70(b); 22/10. This excludes other healthcare professionals who provide significant care to the patient and who have the power to refer. This renders EOLOA and its incorporation of the HCRCA not generally applicable.

d. EOLOA applies only to those it labels as terminal, defined as those with "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." *Id.* This categorially exempts all other seriously ill individuals, as well as those who might seek to end their lives due to non-life-threatening illnesses, rendering EOLOA and its incorporation of the HCRCA not generally applicable.

158. A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added).

159. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* The comparability analysis "is concerned with the *risks* various activities pose" to the government's purported interest, not the "*reasons why*" people engage in those activities. *Id.* (emphasis added).

160. By carving out certain patients, providers, and facilities from its scope, Illinois has focused on the "reasons why" a person may pursue suicide, not on the "risks" to its interest in protecting its citizens from the dangers of suicide.

161. Alternatively, the exceptions in EOLOA and its incorporation of the HCRCA undermine the State's purported interest in allowing Illinois residents to pursue the "fundamental right to determine their own medical treatment options in accordance with their own values, beliefs, or personal preference," 410 ILCS § 22/5(a)(4).

162. Because EOLOA and its incorporation of the HCRCA are not generally applicable, they trigger strict scrutiny, which they cannot pass.[18]

163. Plaintiffs have sincere religious beliefs that require them to provide life-affirming care that respects the dignity of every human life until natural death. Their sincere religious beliefs prohibit them from cooperating in any gravely immoral act, including physician-assisted suicide. *See, e.g.*, *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 724 (2014); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 693-96 (2020) (Alito, J., concurring) ("Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question, and our cases have made it clear that courts cannot override the sincere religious beliefs of an objecting party on that question").

---

[18] By contrast, Illinois' general criminal prohibition on assisting a suicide *does* pass strict scrutiny, because the state has a compelling interest in protecting the uniquely valuable life of each of its citizens, and there is no less-restrictive alternative that will protect that interest.

164. EOLOA and its incorporation of the HCRCA substantially burden those free exercise rights by requiring Plaintiffs to, among other things, inform patients about physician-assisted suicide, qualify patients for assisted suicide, and refer patients seeking physician-assisted suicide to willing providers.

165. Defendants have no compelling interest in forcing Plaintiffs to participate in physician-assisted suicide.

166. Defendants have not selected the least-restrictive means of furthering any alleged governmental interest.

167. Plaintiffs and the patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count II**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise Clause**
**Not Neutral: Religious Gerrymander**

168. All preceding paragraphs are incorporated by reference.

169. Under the Free Exercise Clause, it is "never permissible" to target religious beliefs and religious status for disfavored treatment. *Lukumi*, 508 U.S. at 533.

170. Imposing "special disabilities on the basis of religious views" triggers strict scrutiny. *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 460-61 (2017).

171. "A law that targets religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson v. Makin*, 596 U.S. 767, 780-81 (2022).

172. Because the Free Exercise Clause even "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," *Lukumi*, 508 U.S.

at 534, a law is not neutral where its effects "fall[] disproportionately on religious observers" such that "the law's checkered application can only be explained as a 'religious gerrymander.'" *Mahwikizi v. Ctrs. for Disease Control & Prevention*, 573 F. Supp. 3d 1245 (N.D. Ill. 2021) (quoting *Lukumi*, 508 U.S. at 534).

173. A "religious gerrymander" occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 535-536.

174. EOLOA and the HCRCA lack any exemption for its counseling mandate, despite the well-known fact that many religious healthcare providers, including many Muslim providers, object to participating in physician-assisted suicide in any way.

175. EOLOA and the HCRCA force providers to participate in the initial step of qualifying a patient for assisted suicide, despite the well-known fact that many religious healthcare providers, including many Muslim providers, object to participating in physician-assisted suicide in any way.

176. EOLOA and the HCRCA force religious providers to refer patients to "able and willing" providers to escape the remainder of qualifying patients for assisted suicide, and prescribing assisted suicide drugs, despite the well-known fact that many religious healthcare providers, including many Muslim providers, object to participating in physician-assisted suicide in any way.

177. On information and belief, most providers who object to providing information about, referring patients, or qualifying patients for physician-assisted suicide do so based on religious objections.

178. EOLOA and the HCRCA thus create a religious gerrymander by targeting a subset of religiously motivated actors.

179. EOLOA and the HCRCA therefore "violate[] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

180. Defendants cannot satisfy strict scrutiny because they lack a compelling interest and the law is not narrowly tailored.

181. Plaintiffs, and the patients they serve, will suffer irreparable harm absent declarative and injunctive relief.

**Count III**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Compelled Speech**

182. All preceding paragraphs are incorporated by reference.

183. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Accordingly, the Constitution does not "allow[] a government to coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative v. Elenis*, 600 U.S. 570, 598 (2023).

184. These "First Amendment[] protections extend to licensed professionals much as they do to everyone else." *Chiles v. Salazar*, 607 U.S. 627, 642-43 (2026); *see NIFLA v. Becerra*, 585 U.S. 755, 766-67 (2018).

185. When the government "compel[s] clinics [and providers] to speak the State's message, the law regulate[s] speech based on its content." *Chiles*, 607 U.S. at 643 (citing *NIFLA*, 585 U.S. at 766).

186. Such content-based laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766; *see Brown v. Ent. Merchs.*, 564 U.S. 786, 799 (2011).

187. When the government "seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject," the law also discriminates based on viewpoint, making "the violation of the First Amendment … all the more blatant." *Chiles*, 607 U.S. at 641.

188. EOLOA and the HCRCA compel speech in ways that discriminate based on both content and viewpoint.

189. EOLOA and the HCRCA force Plaintiffs to advise and counsel patients about the availability and "benefits" of assisted suicide as a legitimate treatment option for certain patients.

190. EOLOA and the HCRCA therefore prohibit Plaintiffs from advising and counseling patients about their treatment options without including the government's preferred message that assisted suicide as a treatment option for certain patients.

191. Going still further, EOLOA and its incorporation of the HCRCA expose Plaintiffs to criminal liability for exerting "undue influence" or "coercion" of their patients if they follow their religious beliefs and seek to dissuade their patients from choosing assisted suicide.

192. And EOLOA forces Plaintiffs to document a patient's request for suicide, which EOLOA defines as the first step in qualifying a patient for a procedure they find gravely immoral and detrimental to the patient's well-being.

193. EOLOA and the HCRCA are content-based because they, among other things, compel speech that "draws distinctions based on the message a speaker conveys" about assisted suicide. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). EOLOA and the HCRCA are therefore "presumptively unconstitutional." *NIFLA*, 585 U.S. at 766.

194. EOLOA and the HCRCA discriminate based on viewpoint because, among other things, the "specific motivating ideology" promoted by the state is that assisted suicide is a legitimate treatment option. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

195. Plaintiffs are unable to speak *their* preferred message that, consistent with their sincere religious beliefs, assisted suicide is not a legitimate treatment option for any disease, without threat of criminal penalty.

196. Plaintiffs also have a First Amendment interest in expressing and maintaining a consistent moral message; requiring them to facilitate or endorse contrary communications infringes their right against compelled speech.

197. Plaintiffs are threatened with professional discipline, fines, and criminal liability if they stand on their rights and speak their preferred message rather than the government's.

198. Defendants have no compelling interest in forcing religious objectors to state their preferred message, nor is the law narrowly tailored.

199. Plaintiffs will suffer irreparable harm absent declaratory and injunctive relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise of Religion**

200. All preceding paragraphs are incorporated by reference.

201. The Free Exercise Clause protects "first and foremost, the right to believe and profess, but also the right to engage in religiously motivated conduct." *Korte v. Sebelius*, 735 F.3d 654, 676 (7th Cir. 2013) (cleaned up). Thus, the government can neither prohibit religious exercise outright, nor pressure an individual to forego his religious exercise.

202. Where a government makes it impossible for an individual to participate in his religious observances, it has substantially burdened that religious exercise. *See id.* at 682-83. This is especially salient where a policy would leave an individual "unable to engage in protected religious exercise in the final moments of his life." *Ramirez v. Collier*, 595 U.S. 411, 433 (2022).

203. So too, "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or … denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to

modify his behavior and to violate his beliefs, a burden upon religion exists;" and, even if "the compulsion" is "indirect," "the infringement upon free exercise is nonetheless substantial." *Thomas v. Rev. Bd.*, 450 U.S. 707, 717-18 (1981).

204. Consistent with their sincere religious beliefs, many of the current and prospective patients served by Plaintiffs believe that artificially hastening natural death is gravely sinful. Also consistent with their sincere religious beliefs, they do not wish to discuss, nor entertain discussion of, the so-called "benefits" of committing suicide.

205. EOLOA and the HCRCA substantially burden these patients' rights to approach death consistent with their faith or personal moral convictions. Their attending physician would be required to discuss assisted suicide as a legitimate treatment option, during a time when they may already be experiencing deep distress over their terminal diagnosis and may have no interest in hearing their trusted physician suggest that they consider a course of action that their faith or personal moral convictions forbid.

206. Moreover, EOLOA and the HCRCA put these patients to a perverse choice: either seek end-of-life care from a physician or nurse practitioner who will discuss the option of suicide and its "benefits" with them as a legitimate medical treatment or forego end-of-life care altogether.

207. As set forth above, EOLOA and the HCRCA are neither neutral nor generally applicable.

208. Defendants have no compelling interest justifying the infringement on these patients' free exercise of religion.

209. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

210. Plaintiffs maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996) (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

211. Defendants have no compelling interest in forcing religious objectors to state their preferred message, nor is the law narrowly tailored.

212. The current and prospective patients served by Plaintiffs will suffer irreparable harm absent declaratory and injunctive relief.

**Count V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Freedom of Religious Association and Right of Assembly**

213. All preceding paragraphs are incorporated by reference.

214. The Supreme Court has "long understood" that "[t]he First Amendment guarantees all Americans" a "right to associate with others." *First Choice Women's Res. Ctrs. v. Davenport*, 608 U.S. 174, 184 (2026).

215. This freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *See id.*; *Boy*

*Scouts v. Dale*, 530 U.S. 640, 647-48 (2000); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 862-63 (7th Cir. 2006); *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023).

216. "[A]ssociational rights carry special significance for political, social, religious, and other minorities," and "government actions tending to curtail the freedom to associate warrant the closest scrutiny." *First Choice*, 608 U.S. at 184 (cleaned up).

217. The right of assembly protected by the First Amendment also guarantees these patients the right to gather with those who share their common religious beliefs. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito, J., joined by Kagan, J., concurring).

218. Some of the current and prospective patients served by Plaintiffs wish to receive and associate with healthcare providers who agree to respect their Islamic religious conduct standards regarding matters concerning the end of life, including physician-assisted suicide. This expression of belief includes the view that assisted suicide is not a legitimate treatment option and is inconsistent with human dignity and God's role as the giver of life.

219. Yet EOLOA and the HCRCA would force Plaintiffs to engage in both words and conduct that towards these religious patients that would undermine their religious expression, such as by advocating for actions inconsistent with their shared religious beliefs and messages. Thus, both Plaintiffs and the religious patients who seek them out because of their shared faith would be forced into expressive associations that directly undermine and contradict their religious expression.

220. These patients wish to exercise their associational rights by seeking Muslim healthcare providers like Plaintiffs who will not infringe upon their dignity by implying, explicitly or implicitly, that assisted suicide is a legitimate treatment option that has "benefits." By forcing patients to associate with those speaking a message that suicide is a legitimate option, Defendants have burdened that right.

221. Defendants have no compelling interest justifying the infringement on these patients' freedom of association.

222. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

223. Plaintiffs maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer*, 100 F.3d at 508 (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

224. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VI**
**42 U.S.C. § 1983**
**Violation of the Americans with Disabilities Act**

225. All preceding paragraphs are incorporated by reference.

226. Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination." 42 U.S.C. § 12132.

227. A "public entity" includes State and local governments, their agencies, and their instrumentalities. *Id.* § 12131(1).

228. Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

229. The ADA defines a qualified individual with a disability as a person who has "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," *id.* § 12102(2)(A).

230. "[M]ajor life activit[ies]" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

231. Discrimination occurs when, among other things, disabled people are offered services that are "not equal to" those provided to others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii).

232. Plaintiffs serve patients who are qualified individuals with disabilities.

233. Many of Plaintiffs' patients who receive terminal diagnoses as defined by EOLOA are qualified individuals with disabilities under the ADA.

234. Defendants' policy of forcing Plaintiffs to inform terminally ill patients with disabilities about the option of assisted suicide, while protecting them from offering

suicide to nondisabled patients, amounts to discrimination against their patients under Title II of the ADA.

235. Plaintiffs maintain close relationships with their current and prospective terminal patients, who are not readily identifiable or able to assert their own rights in a timely fashion. *See Shimer*, 100 F.3d at 508 (third party standing satisfied where there is a "hindrance to the third party's ability to protect his own interest").

236. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VII**
**Violation of U.S. Const. Art. VI, cl. 2.**

237. All preceding paragraphs are incorporated by reference.

238. The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

239. The Supreme Court has "held that state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner v. Myrick*, 514 U.S. 280, 287 (1995)).

240. Federal law prohibits Plaintiffs from using federal healthcare funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." 42 U.S.C. § 14402(a)(1).

241. EOLOA and the HCRCA compel Plaintiffs to violate that ban by directly funding services that facilitate assisted suicide, including but not limited to information, counseling, qualification, and prescribing.

242. It is not possible to comply with both laws by separating all information and counseling related to suicide and qualification for assisted suicide from the treatment provided by Plaintiffs, since EOLOA and the HCRCA mandate that such information, counseling, qualification, prescription, and administration be overseen by attending physicians as part and parcel of the patient's general treatment.

243. It is impossible for Plaintiffs to "comply with both its state-law duty to" provide these services "and its federal-law duty not to" do so. *Mut. Pharm. v. Bartlett*, 570 U.S. 472, 480 (2013).

244. "Accordingly, the state law is pre-empted." *Id.*

245. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VIII**
**42 U.S.C. § 18113**
**Violation of the Affordable Care Act; Prohibition against Discrimination on Assisted Suicide**
**Suit in Equity**

246. All preceding paragraphs are incorporated by reference.

247. The Affordable Care Act says that "any State … that receives Federal financial assistance … may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in

causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing.” 42 U.S.C. § 18113(a).

248. On information and belief, the State of Illinois receives Federal financial assistance within the meaning of the Affordable Care Act.

249. Plaintiffs are within the zone of interests protected by 42 U.S.C. § 18113(a).

250. As described above and incorporated here by reference, through EOLOA and the HCRCA, Illinois discriminates against Plaintiffs “on the basis that [they] do[] not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual.” *Id.*

251. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

**Count IX**
**42 U.S.C. § 1983**
**U.S. Const. Amend. XIV: Equal Protection**

252. All preceding paragraphs are incorporated by reference.

253. The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

254. EOLOA and the HCRCA are unconstitutional because they treat people who are disabled by reason of a terminal illness on unequal terms with similarly situated people without a rational basis or compelling interest.

255. EOLOA and the HCRCA discriminate against people who are disabled by reason of a terminal disease, denying protections and safeguards, without any rational basis. This undermines and interferes with Illinois’ interest in suicide

prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently.

256. Diagnoses of terminal illnesses are inherently uncertain. Some people with terminal diagnoses can make full recoveries. Others can live for many years with adequate care and treatment, such as that provided by Plaintiffs. All of these factors demonstrate the uncertainty of a terminal diagnosis and the lack of even a rational basis for this distinction in law.

257. Because EOLOA and the HCRCA implicate a fundamental right—the right to live—the discrimination warrants a heightened level of review.

258. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count X**
**42 U.S.C. § 1983**
**U.S. Const. Amend. XIV: Equal Protection**

259. All preceding paragraphs are incorporated by reference.

260. Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

261. The Equal Protection Clause prohibits discrimination on the basis of religion.

262. Defendants have deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through statutes that treat Plaintiffs differently than similarly situated individuals because of Plaintiffs' religious beliefs

regarding the end of life and their religious obligations to avoid cooperation in assisted suicide.

263. EOLOA and the HCRCA discriminate between religious individuals who, like Plaintiffs, have religious objections to helping a patient identify and locate providers or institutions that will evaluate and qualify a patient for, and prescribe that patient, assisted suicide drugs, and those who do not.

264. EOLOA and the HCRCA thus "differentiate[] between religions along theological lines." *Catholic Charities Bureau v. Wisc. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025).

265. Defendants have no compelling interest justifying the infringement on Plaintiffs' Fourteenth Amendment rights.

266. Defendants have not used the least-restrictive means of advancing any purported compelling interest.

267. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Issue a temporary restraining order and a preliminary and permanent injunction preventing Defendants and all those acting in concert with them from requiring Plaintiffs to counsel patients about assisted suicide; provide information about assisted suicide; assist a patient to qualify for assisted suicide in any way; write a prescription for suicide drugs; or to refer a patient to a provider willing to complete

any of these steps; or falsely fill out a death certificate for a patient who dies by assisted suicide;

b. Issue a temporary restraining order and a preliminary and permanent injunction preventing Defendants and all those acting in concert with them from taking any adverse action against Plaintiffs for encouraging patients to pursue avenues other than assisted suicide based on their religious beliefs;

c. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the First Amendment's Free Speech Clause and Free Exercise Clause;

d. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate Title II of the Americans with Disabilities Act;

e. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, are preempted by the Assisted Suicide Funding Restriction Act of 1997;

f. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the Affordable Care Act;

g. Declare that EOLOA, and the HCRCA as it relates to counseling and referring for assisted suicide, violate the Equal Protection Clause of the Fourteenth Amendment;

h. Award Plaintiffs nominal, compensatory, actual, and punitive damages for the loss of their rights under federal law;

i. Award attorneys' fees and costs under 42 U.S.C § 1988; and

j. Award any such other relief as the Court may deem just and proper.

Respectfully submitted this 16th day of September, 2026.

/s/ Mark L. Rienzi
Mark L. Rienzi
Laura Wolk Slavis
Adèle A. Keim
Benjamin A. Fleshman
Siena A. Marcelle
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095
mrienzi@becketfund.org

*Attorneys for Plaintiffs*

## VERIFICATIÓN OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Akbar M. Ali, declare under penalty of perjury as follows:

1. I am a board-certified attending physician practicing in Illinois. I am authorized to make this declaration on behalf of myself.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning myself are true and correct to the best of my knowledge, information, and belief.

Dated: 9/15/26

Akbar M. Ali, M.D.

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Omar S. Hussain, declare under penalty of perjury as follows:

1. I am a board-certified pulmonologist practicing in Illinois. I am authorized to make this declaration on behalf of myself.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning myself are true and correct to the best of my knowledge, information, and belief.

Dated: 9/16/26

[signature]

Omar S. Hussain, D.O.

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Umar M. Shakur, declare under penalty of perjury as follows:

1. I am a board-certified cardiologist practicing in Illinois. I am authorized to make this declaration on behalf of myself.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning myself are true and correct to the best of my knowledge, information, and belief.

Dated: 9-15-2026

Umar M. Shakur, D.O.

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Asim K. Babar, declare under penalty of perjury as follows:

1. I am a board-certified cardiologist practicing in Illinois. I am authorized to make this declaration on behalf of myself.

2. I have read the foregoing Verified Complaint. The statements in the Verified Complaint concerning myself are true and correct to the best of my knowledge, information, and belief.

Dated: 9/15/2026

Asim K. Babar, M.D.